Philip R. Hoffman. Esq.
Jonathan T. Shepard, Esq.
Bryan T. Mohler, Esq.
PRYOR CASHMAN LLP
Attorneys for Plaintiff
7 Times Square
New York, New York  10036-6569
(212) 421-4100
phoffman@pryorcashman.com
jshepard@pryorcashman.com
bmohler@pryorcashman.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

CARBURES EUROPE, S.A.,                                :        15 Civ.

                                    Plaintiff,         :        **COMPLAINT**

            - against -                                :

EMERGING MARKETS INTRINSIC CAYMAN LTD.,    :
EMERGING MARKETS INTRINSIC, LTD., BULENT
TOROS, ERIC MAASS and NOMURA PB NOMINEES   :
LTD.,
                                                      :
                                    Defendants.
                                                      :
-------------------------------------------------------------------------x

      Plaintiff Carbures Europe, S.A. ("Carbures"), by its attorneys, Pryor Cashman LLP, as

and for its Complaint against defendants Emerging Markets Intrinsic Cayman Ltd. ("EMI

Cayman"), Emerging Markets Intrinsic, Ltd. ("EMI Ltd." and with EMI Cayman, collectively

"EMI" ), Bulent Toros ("Toros"), Eric Maass ("Maass") and Nomura PB Nominees Ltd.

("Nomura"), alleges as follows:

## NATURE OF THE ACTION

    1.    This is a lender liability action by Carbures against EMI, Toros, Maass and

Nomura for:  (a) breach of contract; (b) breach of the duty of good faith and fair dealing; (c)

fraud; and (d) conversion, all arising out of EMI's and Nomura's unlawful behavior in connection with the Margin Lending Agreement (the "MLA") entered into between Carbures, EMI and others on September 25, 2015. A copy of the MLA is annexed hereto as Exhibit A.

2.      In accordance with the MLA, EMI, as lender, agreed to loan Carbures, as borrower, a total of €7.0 million (in two separate installments of €3.0 and €4.0 million), repayable in four years at an interest rate of 6% per annum. Carbures also agreed to issue a warrant to EMI entitling it to purchase €7 million worth of Carbures stock at a 25% discount. As collateral for the loan, Neuer Gedanke, S.L. ("Neuer") and BTC DOS S.ár.l ("BTC"), the two major shareholders of Carbures, were to deposit into SRT Capital FF LLC ("SRT"), a special purpose vehicle created for the transaction, Carbures shares valued at twice the amount of the loan, *i.e.,* approximately €14 million worth of shares (the "Share Collateral" or "Collateral"), with such shares to be deposited  prior to each of the two disbursements of the loan proceeds. Carbures shares are listed and traded on the Mercado Alternativo Bursátil, *i.e.,* Spain's Alternative Investment Market.

3.      The MLA specifically provided that EMI was only authorized to lend the Collateral to itself and within SRT and that "[e]xcept under or after an Event of Default scenario or allowed as a hedge under Exhibit A hereto [the Margin Lending Agreement Term Sheet], Collateral will not be (i) loaned, pledged, repledged, hypothecated or rehypothecated outside of the Lender or structure itself or (ii) sold or traded in any exchange or over-the-counter transactions."

4.      In mid-October 2015, after the closing of the transaction,  Neuer and BTC deposited 6,315,810 shares into an SRT account at Nomura, after which EMI disbursed €3 million, the first loan installment, to Carbures.

5.      Notwithstanding the MLA's express prohibition, EMI, through Nomura, has been loaning and selling the Collateral in numerous transactions and in such great volume (millions of shares) that Carbures shares, which were trading at €1.20 prior to the commencement of EMI's unlawful trading on October 23, 2015, have lost 35% of their value and, as of November 20, 2015, were trading at €0.78.  This trading activity is part of a "sell high" and "buy low" scheme by EMI calculated to seize upon the illiquidity of Carbures stock in order to achieve risk-free profit.  EMI is selling large quantities of Carbures stock to induce a decline in the share price, allowing it to profit by subsequently repurchasing the shares at a lower per share price.

6.      Immediately upon learning of EMI's unlawful trading activity, Carbures contacted EMI and Nomura on November 3 and 4, 2015, informed them of the irreparable harm that their unlawful activity was causing to Carbures' share price and demanded that EMI and Nomura immediately cease and desist from any further loans or sales of the Collateral.  EMI and Nomura refused to stop loaning and trading the Collateral, resulting in, *inter alia*, a material breach of the MLA.

7.      Although Carbures has honored all of its obligations under the MLA, EMI, realzing that the only way it could loan and/or sell the Collateral was if an "Event of Default" occurred, decided to create such an event out of whole cloth by claiming on November 11, 2015 that because Carbures had failed to deliver to Nomura the 8,421,053 Carbures shares which had to be deposited before EMI became obligated to disburse the €4 million balance of the loan, an Event of Default had occurred.  Purposely ignored by EMI was the fact that the MLA did not provide any date by which the shares had to be deposited or, for that matter, by which the funds had to be disbursed.  Thus, no Event of Default had occurred and Carbures immediately so informed EMI of that fact.

3

8.      Notwithstanding that no Event of Default has occurred, EMI and Nomura have not only continued to loan and sell the Collateral, but they have grossly increased the volume of shares being traded.  On November 16, 2015 alone, Nomura sold 300,116 shares and over 1,159,449 Carbures shares, more than six times the average trading volume, were traded on the Mercado Alternativo Bursátil, resulting in Carbures' share price falling from €0.95 to €0.87, a decrease of over 8% in a single day.  As a result of their unlawful activity, Carbures share price is, as of November 20, 2015, down to €0.78, a 35% decrease in value from the share price on October 23, 2015.

9.      By its unlawful trading and loaning of Carbures shares, EMI has breached the MLA and the duty of good faith and fair dealing.  In addition, EMI, Toros, Maass and Nomura have committed fraud and converted the Collateral.  The unlawful trading of Carbures shares by EMI and Nomura, is causing and, unless enjoined, will continue to cause Carbures irreparable harm.

**THE PARTIES**

10.     Plaintiff Carbures Europe, S.A. is a a *sociedad anónima* organized under the laws of Spain with a principal place of business at Tecnoparque Bahía de Cádiz, Ctra El Puerto Santa María – Sanlúcar km 5.5, Calle Ingeniería, 4, 11500 El Puerto de Santa María, Cádiz (Spain).

11.     Defendant Emerging Markets Intrinsic Cayman Ltd. is a Cayman Islands company with a principal place of business at 31 Thimble Farms Road, Suite 200, Branford, Connecticut  06405.

12.     Defendant Emerging Markets Intrinsic, Ltd. is a Cayman Islands company with a principal place of business at 31 Thimble Farms Road, Suite 200, Branford, Connecticut  06405.

13.     Defendant Bulent Toros is the Managing Director of Defendant Emerging Markets Intrinsic Cayman Ltd. and, upon information and belief, a citizen of the Cayman Islands residing in George Town, Grand Cayman KY1-1105.

14.     Defendant Eric Maass is the Managing Partner of Defendant Emerging Markets Intrinsic Ltd. and, upon information and belief, a citizen of the State of Connecticut residing at 459 New Haven Avenue, Milford, Connecticut  06460.

15.     Defendant Nomura PB Nominees Ltd. ("Nomura") is, upon information and belief, a company organized under the laws of the United Kingdom with a principal place of business at 1 Angel Lane, London, EC4R 3AB, United Kingdom.

## JURISDICTION AND VENUE

16.     Section 7(j) of the MLA provides:  "This Agreement shall be deemed to have been made in the State of New York and shall be construed, and the contractual and all other rights and liabilities of the parties determined, in accordance with the law of the State of New York without giving effect to any conflicts of law principles thereof.

17.     Section 7(k) of the MLA provides, in relevant part:  "With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party."

18.     The parties have attempted in good faith to resolve the disputes which are the subject of this Complaint and have been unable to do so.

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C §1332 because Plaintiff is a citizen of a foreign state (Spain) and Defendants are citizens of the State of Connecticut.  The amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

20.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because:  (a)  the agreement at issue, the MLA,  was made in the State of New York; (b) all defendants are subject to jurisdiction in this District; and (c) the parties have agreed in the MLA that venue in this District is proper.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

21.     Carbures is a public multinational company engaged in engineering design, manufacturing and delivery of composite structures, machinery and engineering systems for the aerospace and defense, automotive, civil works and railway industries.  Carbures shares are listed and traded on the Mercado Alternativo Bursátil, *i.e.,* Spain's Alternative Investment Market..

### The Negotiation of the Margin Lending Agreement

22.     In May 2015, Carbures, in need of financing, met in Madrid with Ángel García Mingo and Juan Miguel Jácome ("Jácome") of Corporation Global Network Advisors, S.A. ("Global"), a consulting firm which came to Carbures to present a financing proposal from EMI Cayman (the "EMI Proposal").

23.     The EMI Proposal provided that EMI Cayman would lend money to Carbures and the loan would be collateralized by shares of Carbures stock which would be sent to an SPC account at Citibank or Nomura.  EMI Cayman also proposed that it be allowed to engage in hedging options if there were adverse movements in the Carbures stock price.

24.     Carbures, in its communications with Global to be forwarded to EMI, made it clear from the very first moment that it did not want EMI to short the Carbures stock it would be holding pursuant to the proposed loan agreement.  Global, on behalf of EMI, assured Carbures that EMI would not short the stock.  On May 13, 2015, Jacome sent Baron an e-mail in which he transmitted the following representation from EMI:

> Shorting shares would pull down the stock and that would hurt the risk profile of the loan.  So mind you that lender's and borrower's interests are aligned when it comes to price movement of the stock.  Besides, you cannot short this stock.  It is not liquid and float is limited.
>
> Having said that, Lender has the contractual power to engage in OTC options including puts, total return swaps and other derivatives/techniques to minimize his risk if there are adverse movements in the stock price.  (emphasis supplied).

25.     Direct negotiations between Carbures and EMI commenced shortly thereafter and continued through the summer of 2015.  Baron was the primary representative for Carbures in those negotiations.  EMI was represented by defendant Bulent Toros ("Toros"), the Managing Director of EMI Cayman, and defendant Eric Maass ("Maass"), the Managing Member of EMI Ltd.

26.     On August 24, 2015, Carbures and EMI Cayman executed a Credit Agreement Term Sheet dated August 18, 2015 ("Credit Agreement Term Sheet") pursuant to which:  (a) EMI agreed to loan Carbures €7 million, in two separate installments, repayable in four years at 6% interest; and (b) Carbures agreed to transfer, as collateral, €14 million worth of Carbures Capital Shares, in two separate installments, into a segregated portfolio account held by SRT, a special purpose vehicle created for the transaction.  The Credit Agreement Term Sheet provided that EMI Cayman had the right to hedge its exposure in shares, but was clear that the shares being held as collateral could only be sold if an Event of Default (as defined therein) occurred.

27.    Following the execution of the Credit Agreement Term Sheet, EMI Cayman drafted and transmitted to Carbures a lending agreement, subscription documents for SRT, and other transaction documents.  During the negotiations, the parties agreed that Carbures would be the borrower under the Margin Lending Agreement and that the shares to be used for collateral would come from Neuer Gedanke, S.L. ("Neuer") and BTC DOS S.ár.l ("BTC"), two major Carbures shareholders, and be deposited into SRT, with Neuer and BTC becoming the sole shareholders of SRT.  SRT would be managed, however, by EMI.

28.    Throughout the negotiations, Carbures made it clear, including in an August 28, 2015 e-mail that Baron sent to Toros and Maass, that "no lending [of the shares] shall be permitted.  Hedging or OTC operations shall permitted as long as the shares are not used."  On that same day, Toros responded to Baron and represented that the Carbures shares "will not be loaned or re-hypotheticated.  Exposure will remain consistent as long as there is no Event of Default.  Language in 5c [draft of MLA] simply refers to the fact that operationally shares has to be pledged to EMI Cayman for the legal pledge to be perfected."

29.    As negotiations moved into the first week of September 2015, Baron continued to emphasize to EMI that the Carbures collateral shares could not be traded.  On September 1, 2015, Toros sent Baron an e-mail in which he once again represented to Carbures:  "No trading: as explained many times before, SPV's exposure to Shares will remain constant and unchanged as long as there is no Event of Default.  However, this does not disable Investment Manager from putting on hedges (OTM puts or total return swaps or other vanilla or exotic instruments) to hedge his risk."

30.    On September 21, 2015, Toros against represented to Baron in an e-mail that EMI would not take any action that would impact Carbures' share price, writing:

8

[T]he stock is very illiquid and at very distressed levels.  In this deal, the only way EMI makes decent money from the deal, is if the stock rallies and reverts back to historical averages.  EMI will be de facto long the Carbures shares via the warrant. So it is in EMI's interest to ensure that there is no selling pressure on the stock for a minimum of 2 years so that stock can breathe and take off after next year's financial results.  (emphasis supplied).

31.     With respect to the Carbures shares to be used as Share Collateral, Baron informed EMI on September 24, 2015 that the first installment of 6,315,789 shares to cover the initial loan proceeds of €3 million would be contributed 20% by Neuer (1,263,158 shares) and 80% by BTC (5,052,632 shares).  When the time came for the second installment of the loan to be made by EMI (there was no specific time for this to occur), Neuer would contribute the entire 8,421,053 shares necessary to cover that installment and would also acquire BTC's interest in SRT.  As a result, all of the Share Collateral at that point would consist of Carbures shares owned by Neuer.

**The MLA Transaction Closes On September 29, 2015**

32.     On or about September 29, 2015, the transaction closed and the following documents were executed:  (a) Margin Lending Agreement; (b) Margin Lending Agreement Term Sheet; (c) two Subscription Agreements, one between SRT and BTC and the other between SRT and Neuer, (d) Warrant to Purchase Capital Stock from Carbures to EMI Cayman; and (e) Amended and Restated Operating Agreement of SRT.

33.     The Margin Lending Agreement ("MLA") was entered into by and among EMI Cayman, EMI Ltd., Carbures, SRT, Neuer and BTC.  The terms applicable to the loan were, for the most part, set forth in the Margin Lending Agreement Term Sheet ("MLA Term Sheet") annexed as Exhibit A to the MLA, which expressly superseded the Credit Agreement Term Sheet that the parties had executed the previous month.

9

34.     Pursuant to the MLA and MLA Term Sheet, EMI Cayman agreed to lend €7 million to Carbures in two installments, the first for €3 million and the second for €4 million. The loan was payable in four years at a 6% interest rate.

35.     As collateral, Carbures agreed to provide €14 million worth of Carbures' capital stock (the "Share Collateral"), *i.e.,* twice the value of the €7 million loan, in two separate installments. The Share Collateral would be contributed by Neuer and BTC to SRT pursuant to Subscription Agreements providing them with a membership interest in SRT. SRT, which was managed by EMI Cayman, would then provide the Share Collateral to EMI Cayman on behalf of Carbures. Carbures shares were trading at €0.95 per share when the transaction closed and that was the Initial Value that Carbures and EMI agreed would be used to calculate the number of Carbures shares required to be used as Share Collateral.

36.     EMI Cayman was to disburse the first loan proceeds of €3 million once €6 million worth of Carbures shares were contributed to SRT as collateral. The second loan proceeds of €4 million were not to be disbursed until an additional €8 million worth of Carbures shares were contributed to SRT as collateral. EMI Ltd. was responsible for taking all actions necessary to effectuate the loans to be made under the MLA.

37.     The MLA specifically provided at §5(c) that EMI was only authorized to lend the Collateral to itself and within SRT and that "[e]xcept under or after an Event of Default scenario or allowed as a hedge under Exhibit A hereto [the MLA Term Sheet], Collateral will not be (i) loaned, pledged, repledged, hypothecated or rehypothecated outside of the Lender or structure itself or (ii) sold or traded in any exchange or over-the-counter transactions." The MLA Term Sheet provided: "Lender has the right to hedge Exposure in Shares using any strategy Lender deems suitable and all exposure and risk of the Lender related to the counterparty to such

strategy shall be for the account of the Borrower." The MLA Term Sheet nowhere provided that EMI Cayman could sell, trade or loan the Share Collateral, except for limited hedging activities.

38.     In accordance with MLA §6(c), if an Event of Default occurred, EMI Cayman's recourse under both the MLA and MLA Term Sheet was limited to the Share Collateral. The MLA Term Sheet provided that EMI Cayman may immediately "enforce its right under the pledge over the Collateral Accounts to recover the Loan Amount plus any other owing outstanding cash amounts."

39.     In the event of a breach by EMI, §7(l) of the MLA provides, in full:

> NO CONSEQUENTIAL DAMAGES.  IN NO EVENT WILL LENDER OR
> AGENT [EMI Ltd.] BE LIABLE TO BORROWER, SRT, BTC OR NG FOR
> ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL
> DAMAGES ARISING OUT OF THIS AGREEMENT or any other agreement or
> document executed in connection herewith or the transactions contemplated
> hereby or thereby or any lost profits, diminution in value of Share Collateral or
> loss of the use of property or Share Collateral.  (emphasis supplied).

40.     Carbures also issued a Warrant to EMI Cayman to purchase up to €7 million worth of Carbures shares at a 25% discount, effective between June 30, 2016 and October 2, 2019.

41.     In early October 2015, after the closing of the transaction,  Neuer and BTC deposited a total of 6,315,810 shares into an SRT account at Nomura, after which EMI disbursed €3 million, the first loan installment, to Carbures.

**The Second Transfer of Carbures Shares and Loan Proceeds Is Delayed By EMI**

42.     On October 19, 2015, Baron informed EMI and its counsel, Wayne Martino ("Martino"),  that "Neuer is ready to transfer the shares for the second tranche. Kindly send the subscription agreement at your earliest convenience."

43.     Notwithstanding Carbures' readiness to move forward with the second transfer of shares necessary for it to receive the €4 million in loan proceeds from EMI Cayman, questions arose as to the procedure to be employed for BTC's being taken completely out of any ownership interest in SRT. By October 29, 2015, those issues were resolved and Carbures, Neuer and BTC had signed the necessary documentation to effectuate the transfer. All that was required were the signatures of EMI and SRT. On that day, Baron wrote Martino: "Kindly send the letters signed by EMI and SRT today if possible so Neuer can start with the share transfer." Martino responded that the executed letters would be forthcoming.

**EMI and Nomura Commence Their Unlawful Trading of Carbures Shares**

44.     Commencing as early as October 28, 2015, EMI and Nomura, notwithstanding the strict prohibition in the MLA about selling or lending the Carbures shares which acted as Share Collateral, began selling and loaning the Carbures shares in such quanties that the Carbures stock price went from €1.20 per on October 23, 2015 to €0.78 on November 20, 2015, a 35% decrease in the value of Carbures stock.

45.     Carbures first learned about EMI and Nomura's unlawful trading activity on October 30, 2015. By that point, Carbures' shares had dropped from €1.20 on October 23, 2015 to €1.01 one week later. Baron immediately sent an e-mail to Toros stating:

> In our daily internal review of the CAR shares traded we have seen that Nomura PB Nominees has lent 61,537 and 166,435 CAR shares to Citigroup Global Markets Ltd on October 23 and 26 and Citigroup has made a sale of shares.
>
> Please provide additional details on these transactions. <u>As you know, pursuant to the MLA the Collateral will not be (i) loaned, pledged, repledged, hypothecated or rehypothecated outside of the Lender or structure itself or (ii) sold or traded in any exchange or over-the-counter transactions.</u> (emphasis supplied).

46.     Toros responded to Baron that same day and misrepresented: "We are actively hedging our exposure internally using a variety of strategies one of which is a TRS with an

12

internal affiliate. We have not offered these shares as short borrow to Nomura or any other

broker." Baron immediately responded to Toros and once again asked for information regarding

the trades:

> We acknowledge that hedging exposure is allowed according to the MLA and
> termsheet but as borrowers and/or guarantors and beneficiary owners of SRT we
> would need to understand the rationale for hedging with (i) a performing loan we
> have just entered into a few days ago and (ii) a collateral which on October 23
> was 25% above the initial price and 50% above the margin call and having a
> margin call clause which is applicable if shares price decrease.
>
> If shares have not been offered as short kindly provide additional information on
> the lending by Nomura and sale by Citigroup or provide Nomura's contact details
> so we can confirm that shares have not been sold to a third party. (emphasis
> supplied).

47.     By November 2, 2015, EMI had still not send Carbures the executed letters which

were necessary for Neuer to undertake the share transfer. On that date, Baron wrote to Toros and

Maass: "[K]indly send a pdf copy of the fully executed letter for the second tranche. Attached

are the letters signed by Carbures, NG and BTC. This is an urgent matter." Baron also requested

a "copy of the contract for the custody of shares between SRT and Nomura" and a "certificate

letter or an email from Nomura confirming that they have not entered into any transaction to lend

CAR shares and a statement of account detailing all of the positions it holds in respect of such

shares as of the date hereof."

48.     Although EMI on November 3, 2015, finally sent Baron the fully-executed letter

regarding the second transfer of shares and disbursements of loan proceeds, it did not send the

critical information Baron had requested the previous day regarding the sale and lending of the

Share Collateral. Baron therefore sent another e-mail to Toros, Maass and Martino requesting

the information once again.

49.     When the requested information and documentation were not forthcoming,

Carbures' General Counsel, Tomás Rodríguez Peñamaría ("Peñamaría"), sent a letter to EMI on

November 4, 2015 which stated, in full:

> Reference is made to the recent lending and selling transactions carried out by
> Nomura PB Nominees LTD ("Nomura"), custodian of CAR shares on behalf of
> SRT Capital FF LLC ("SRT"). As you are well aware, Nomura's actions have
> had a significantly harmful impact on Carbures' share price. We estimate that the
> decrease in the market capitalization of Carbures in the last week as a direct result
> of Nomura's actions is approximately 20 million Euros.
>
> The aforementioned decrease in Carbures' market capitalization is a result of the
> following activities carried out by Nomura in the last 4 or 5 business days:
>
> - October 28, 2015: Nomura lent 61,537 shares to Citigroup Global Markets
>   LTD
>
> - October 28, 2015: Nomura PB Nominees LTD sold 61,537 shares to
>   Citigroup Global Markets LTD
>
> - October 29, 2015: Nomura lent 166,435 shares to Citigroup Global Markets
>   LTD
>
> - October 30, 2015: Nomura lent 130,000 shares to Citigroup Global Markets
>   LTD
>
> - November 2, 2015: Nomura lent 129,466 shares to Citigroup Global Markets
>   LTD
>
> We once again call to your attention that the Margin Lending Agreement (the
> "MLA") entered into by and among Emerging Markets Intrinsic Cayman, as
> lender ("EMI"), Carbures Europe S.A., as borrower ("Borrower"), SRT Capital
> FF LLC ("SRT"), Neuer Gedanke, S.L., ("NG"), BTC DOS S.ár.1, ("BTC"), and
> by Emerging Markets Intrinsic, Ltd, as agent ("Agent"), dated September 25,
> 2015 expressly prohibits the lending and sale of the CAR shares, except under
> very limited circumstances. Section 5(c ) of the MLA provides in relevant part as
> follows [emphasis added]:
>
> "Borrower and SRT hereby authorize Lender *to lend only to itself and within
> SRT Capital any or all Collateral*, to convey therewith all attendant rights of
> ownership, and to use all such Collateral as collateral…Except under or after an
> Event of Default scenario or allowed as a hedge under Exhibit A hereto,
> *Collateral will not be (i) loaned, pledged, repledged, hypothecated or*

14

*rehypothecated outside of the Lender or structure itself or (ii) sold or traded in any exchange or over-the-counter transactions.*"

As a result, Nomura, as custodian of the CAR shares, cannot lend or sell the CAR shares.

According to the available data, it appears that NOMURA has lent and sold CAR shares that were assigned to SRT and should have remained in SRT's account as Collateral under the MLA.

After the conference call we held with you yesterday, other than the execution version of the letter for the second tranche of the loan, we have not received any reply nor have we received the documents we requested, in particular, a copy of the executed custodian agreement or other contract regulating the relationship between Nomura and SRT.

In accordance to the foregoing, we hereby demand, on behalf of Neuer Gedanke and BTC, as owners of SRT, that EMI complete the following actions in the next 24 hours:

1.- Unequivocally instruct Nomura to immediately cease the lending and selling activities regarding CAR shares and to revert the loans and sales already made.

2.- Require Nomura to immediately sign an addenda to the custodian agreement or other executed agreement governing the relationship between SRT/Nomura, clearly stating that Nomura shall neither sell nor lend CAR shares and cannot carry out any activities which would result in the lending or transfer of the CAR shares to a third party.

3.— Obtain a written confirmation from Nomura that it has stopped all lending and selling activities with CAR shares and has taken the steps necessary to reverse or unwind the transactions already executed.

4.- Should Nomura fail to comply with the above instructions, EMI and/or SRT shall immediately terminate its agreement with Nomura, in any event no later than 48 hours from the request to comply with the MLA.

Your failure to comply with the foregoing demands will lead to the exercise by of Carbures S.A., Neuer Gedanke and BTC of all remedies available to them at law and equity, including, without limitation, claims for any diminution in value of the CAR shares since October 28, 2015, loss, damages, costs or expenses arising from EMI's and Nomura's failure to comply with the MLA, which to date amounts to approximately 20 million euros.

Please govern yourself accordingly.  (emphasis in original and supplied).

15

50.     Peñamaría sent a nearly identical letter to Nomura on November 3, 2015.
Nomura failed to respond to Peñamaría's letter.

51.     EMI Cayman's Toros responded to Carbures the same day, November 4, 2015,
and stated that EMI Cayman and Nomura would not cease their unlawful activity and believed
that, notwithstanding the clear prohibition in the MLA, their ability to "hedge" meant that they
were allowed to sell and/or lend Carbures shares.  Toros also restated EMI Cayman's refusal to
provide the information and documentation repeatedly requested by Carbures.

52.     In response to Peñamaría's statement that "Nomura's actions have had a signifi-
cantly harmful impact on Carbures' share price" and that "the decrease in the market capitalizat-
ion of Carbures in the last week as a direct result of Nomura's actions is approximately 20 mil-
lion Euros," Toros, relying on the MLA, made it clear that as far as EMI Cayman was concerned,
such injury was not compensable in money damages from EMI Cayman:

> Even if there was a violation of the MLA by Lender (which there was not),
> Section 7(1) of the MLA has a very broad limitation on Lender's and Agent's
> potential liability including an express exclusion of liability for "indirect,
> incidental or consequential damages ... or diminution in value of Share
> Collateral ..." (emphasis supplied).

53.     At the time Peñamaría referred to the €20 million decrease in market
capitalization, Carbures shares were trading at €1.00.  At their current price of €0.78, the
decrease is now in excess of €40 million.

54.     On November 6, 2015, by which time Carbures shares had dropped to €0.99,
Carbures and EMI had a telephone conversation in which EMI refused to cease its unlawful
selling and lending of Carbures shares and disingenuously demanded that Carbures cause the
transfer of the second tranche of 8,241,953 shares of Carbures shares to be made.  EMI repeated
this request in a November 9, 2015 e-mail and demanded that such transfer be made by

November 11, 2015, notwithstanding that: (a) the MLA provided no date by which the second transfer of shares must be made; and (b) considering the unlawful selling and lending of Share Collateral being brazenly engaged in by EMI and Nomura trading, putting even more shares into their hands would have made no sense at all.

55.     On November 9, 2015, by which time its shares had droped to €0.95, Carbures renewed its request for a copy of the contact for the custody of the shares between SRT and Nomura, as well as for a detailed explanation from EMI of its reasons for "hedging" and a summary of the transactions entered into as a result.  On November 10, 2015, EMI once again refused to provide the requested documentation and information and demanded that Carbures cause the transfer of the second installment of Share Collateral to be made.

56.     Based upon EMI's and Nomura's unlawful trading of the Carbures shares being held as collateral and the irreparable harm that such unlawful trading was causing to Carbures' share price, Carbures was not at that moment willing to cause the second transfer of shares to be made and did not do so.  Nor did EMI Cayman disburse the second installment of loan proceeds, €4 million, to Carbures.

57.     Until EMI refused to cease and desist from its unlawful trading, Carbures was ready and intended to pay EMI the €25,000 for unreimbursed costs and expenses at the same time as it transferred the second tranche of shares.

**EMI Cayman Declares A Bogus Event Of Default Under the MLA,**

58.     Although Carbures has honored all of its obligations under the MLA, EMI, realzing that the only way it could justify loaning and/or selling the Collateral was if an "Event of Default" occurred, decided to create such an event out of whole cloth by sending to Carbures, Neuer, BTC and SRT on November 11, 2015 a "Default Notice" claiming that because Carbures

17

had failed to deliver to Nomura the 8,421,053 Carbures shares which had to be deposited before

EMI became obligated to disburse the €4 million balance of the loan, an Event of Default had

occurred. Toros further wrote:

> Pursuant to Section 6(b) of the MLA and the Section of the Term Sheet entitled
> "Consequences of Events of Default and Liquidation Events", and without
> limiting any other rights or remedies that may be available to Lender, Lender
> hereby (a) declares all of the outstanding principal of the Loans, all accrued
> interest accrued and other amounts payable under the MLA or any other
> Transaction Documents, and all other Liabilities and Obligations owing under the
> MLA and the other Transaction Documents to be immediately due and payable
> and hereby demands payment of the same and (b) cancels Lender's commitment
> to make € 4,000,000 installment of the Loan available to Borrower. Pursuant to
> Section 7(b) of the Warrant, due to the Event of Default under the MLA, the
> limitation on Lender's exercise of the Warrant prior to June 30, 2016 is no longer
> applicable or operative. For the avoidance of doubt, this notice is not intended to
> and is not exercise of the Warrant.
>
> The total amount due Lender as of November 11,20.15, exclusive of unreimbur-
> sed costs and expenses since September 30, 2015 including attorneys' fees and
> costs associated with enforcing Lender's rights under the Transaction Documents
> and in connection with the Letter Agreement, is € 4,705,000, consisting of the
> following amounts:
>
> 1.  Principal - E 3,000,000.
> 2.  Interest at 6 percent per annum on 7,000,000 until maturity - E 1,680,000.
> 3.  Unreimbursed costs and expenses — e 25,000.
>
> You are hereby directed to make payment of such amount to Lender at 31
> Thimble Farms Road, Suite 200, Branford, CT 06405. If you prefer to send
> payment by wire transfer, please use the wire instructions set forth on Schedule A
> hereto. Payment of such amount is due immediately but in all events by
> November 13th, 2015.

59.     On the same day, November 11, 2015, Toros also sent a letter to Neuer and BTC

anouncing that EMI Cayman was resigning as manager of SRT and and EMI Ltd. was assigning

and transferring its Administrative Interests to any replacement manager appointed by Neuer and

BTC, the sole holders of economic interests in SRT. By this time, the over 6 million shares of

Carbures shares which Neuer and BTC had deposited into SRT as Collateral for the MLA had already been transferred by SRT at the direction of Toros to Nomura.

60.     On November 11, 2015, Peñamaría, in response to EMI's default notice, sent a letter to EMI rejecting its bogus claim that any Event of Default had occurred. With respect to the unlawful trading activity of EMI and Nomura, Peñamaría stated:

> Shortly thereafter, on or about October 30, 2015, upon reviewing the daily trading reports, we discovered that Nomura PB Nominees was lending and selling shares to third parties in material breach of the MLA. As you are aware, such trading activity has directly resulted in a significant drop in the market value of the Carbures shares.

> Upon receiving confirmation that Carbures' shares had subsequently been sold to a third party, on November 4, 2015, Carbures, in its own name and in the name and on behalf and following instructions from NG and BTC, promptly requested written clarification from EMI regarding such activity.

> In its initial response via email, EMI denied that is had authorized the lending or sale of any Carbures Shares. When pushed for an explanation, EMI stated that it had "internally hedged" with a Total Return Swap.

> When Carbures, in its own name and on the name and on behalf and following instructions from NG and BTC, in turn, demanded an explanation for the lending and selling of the Carbures shares, EMI stated that it was authorized to lend and sell the Carbures shares in accordance with the MLA.

> Carbures has requested, in its own name and in the name and on behalf and following instructions from NG and BTC, clarification and supporting documentation regarding the trades executed in order to get comfortable that any further activity conducted by EMI will not be to the detriment of the Carbures shares.

> The demand for clarification and supporting documentation has been done in good faith. At no point in time, has Carbures stated that NG would not deliver the Additional Shares or that any of NG, BTC or Carbures had any intention of otherwise breaching the MLA for any reason whatsoever.

> Given that EMI has materially breached the MLA and that Carbures is not obligated to deliver the Additional Shares by a date certain, we wholeheartedly disagree with your accusation that we breached the MLA in any manner.

19

61.     On November 12, 2015, EMI responded to Carbures' letter and refused to cease and desist from its unlawful trading, claiming it could hedge it any manner it saw fit to do so.

62.     As Nomura had never responded to Peñamaría's November 3, 2015 letter demanding that it cease and desist its unlawful selling and loaning of Carbures shares, Peñamaría wrote Nomura again on November 12, 2015, stating "we again hereby demand that you immediately cease lending and selling activities regarding CAR shares until this conflict between the parties is solved by the competent authority and to reverse the executed lending and selling operations."

63.     Although Carbures attempted in good faith to resolve its disputes with the Defendants, there was no interest whatsoever on the part of Defendants to cease their unlawful activity.

**EMI and Nomura Greatly Increase Their Unlawful Trading of Carbures Shares**

64.     Between October 28 and November 13, 2015, Nomura:  (a) sold or loaned 722,868 Carbures shares; (b) bought or loaned 1,310,749 shares; and (c) decreased its holding of Carbures shares from 6,157,312 to 5,364,805, a decrease of 792,507 shares.

65.     Citigroup has been a frequent trading partner of Normura.  Between October 28 and November 13, 2015, Citigroup :  (a) sold or loaned 1,516,409 Carbures shares; (b) bought or loaned 1,512,409 shares; and (c) decreased its holding of Carbures shares from 28,661 to 4,181. Notwithstanding the fact that it only had 24,480 less shares than it started with, Citigroup traded over three million shares during that period.

66.     Notwithstanding that no Event of Default has occurred, EMI and Nomura have not only continued to loan and sell the Share Collateral – they have further increased the volume of shares being traded.  On November 16, 2015 alone, Nomura sold 300,116 shares and over

1,159,449 Carbures shares, more than six times the average trading volume, were traded on the Mercado Alternativo Bursátil, resulting in Carbures' share price falling from €0.95 to €0.87, a decrease of over 8% in a single day.

67.    EMI and Nomura continued their unlawful trading in Carbures shares on November 17, 18, 19 and 20, 2015, with the share price dropping over the course of those four days all the way down to €0.78.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract by EMI Cayman and EMI Ltd.)**

68.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 67 as if fully set forth herein.

69.    The MLA specifically provided that EMI was only authorized to lend the Collateral to itself and within SRT and that "[e]xcept under or after an Event of Default scenario or allowed as a hedge under Exhibit A hereto, Collateral will not be (i) loaned, pledged, repledged, hypothecated or rehypothecated outside of the Lender or structure itself or (ii) sold or traded in any exchange or over-the-counter transactions."

70.    EMI, by its unlawful trading of the Collateral as described herein, has materially breached the MLA.

71.    Carbures has made repeated requests and demands on EMI to cease and desist from its unlawful conduct.  EMI has willfully and wrongfully refused to to do.

72.    Carbures has duly performed all the terms and obligations on its part to be performed under the MLA.

73.    Carbures has no adequate remedy at law and is suffering irreparable harm and damage as a result of the aforesaid acts of EMI in an amount not yet determined or ascertainable but, upon information and belief, in excess of $20,000,000.

## SECOND CLAIM FOR RELIEF
### (Breach of the Duty of Good Faith and Fair Dealing by EMI Cayman and EMI Ltd.)

74.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 73 as if fully set forth herein.

75.     Based upon the acts of EMI as set forth above, EMI has breached the duty of good faith and fair dealing imposed by the MLA and other agreements between EMI and Carbures in the performance of said agreements.  The actions of EMI evidence a lack of good faith, including EMI's unlawful trading of the Carbures acting as Collateral, the effect of which has been to diminish Carbures share price between October 23, 2015 and November 20, 2015 by over 35% from €1.20 to €0.78.

76.     Carbures has no adequate remedy at law and is suffering irreparable harm and damage as a result of the aforesaid acts of EMI in an amount not yet determined or ascertainable but, upon information and belief, in excess of $20,000,000.

## THIRD CLAIM FOR RELIEF
### (Fraud By EMI Cayman, EMI Ltd., Toros and Maass)

77.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 76 as if fully set forth herein.

78.     On May 13, 2015, prior to Carbures' execution of the MLA, Global's Jacome misrepresented to Carbures and Baron in an e-mail that EMI would not short the Carbures stock being used as Share Collateral and  would only engage in heding activities if there were adverse movements in Carbures' stock price.

79.     On August 28, 2015, prior to Carbures' execution of the MLA, EMI, Toros and Maass misrepresented to Carbures and Baron in an e-mail that the Carbures shares being held as

collateral would not be loaned or re-hypotheticated and that exposure would remain consistent as long as there was no Event of Default.

80.     On September 1, 2015, prior to Carbures' execution of the MLA, EMI, Toros and Maass misrepresented to Carbures and Baron in an e-mail that there would be no trading of Carbures shares as long as there was no Event of Default.

81.     On September 21, 2015, prior to Carbures' execution of the MLA, EMI, Toros and Maass misrepresented to Carbures and Baron in an e-mail that EMI would not short the Carbures stock  and would ensure that there was no selling pressure on the stock for a minimum of two years.

82.     Upon information and belief, the representation made by EMI, Toros and Maass were false and fraudulent and made with the intent to defraud, deceive and fraudulently induce Carbures into executing the MLA and the related agreements.

83.     Upon information and belief, EMI, Toros and Maass always intended to take immediate steps to loan, sell or othewise deal in the Carbures shares being held as Collateral and failed to disclose such intention to Carbures and Baron during the negotiation of the MLA.

84.     Carbures, in reasonable reliance upon the false, deceptive and misleading material representations and omissions of EMI, Toros and Maass, entered into the MLA and caused Neuer and BTC to deposit 6,315,810 Carbures shares into an SRT account at Nomura

85.     Carbures has no adequate remedy at law and is suffering irreparable harm and damage as a result of the fraudulent actions of EMI, Toros and Maass in an amount not yet determined or ascertainable but, upon information and belief, in excess of $20,000,000.

86.     The fraudulent actions of EMI, Toros and Maass, are such as to warrant an award of punitive damages against them and in favor of Carbures in the amount of $50,000,000.

## FOURTH CLAIM FOR RELIEF
### (Conversion By EMI Cayman, EMI Ltd., Toros, Maass and Nomura)

87.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 86 as if fully set forth herein.

88.     Pursuant to the MLA, Carbures transferred to EMI Cayman (through SRT, a company managed by EMI Cayman), a total of 6,315,810 Carbures shares.  The shares came from Neuer and BTC.

89.     The Collateral was to be held by SRT and was not be sold or loaned in any way.

90.     SRT, acting at the direction of EMI, Toros and Maass, and without any authority to do, intentionally and wrongfully exercised dominion, custody or control over the Collateral and transferred same to defendant Nomura so that the Collateral could be used for their own benefit and to the detriment of Carbures.

91.     Nomura, acting on its own and/or at the direction of EMI, Toros and Maass, has intentionally and wrongfully exercised dominion, custody or control over the Collateral.

92.     Between October 28 and November 13, 2015, Nomura:  (a) sold or loaned 722,868 Carbures shares; (b) bought or loaned 1,310,749 shares; and (c) decreased its holding of Carbures shares from 6,157,312 to 5,364,805, a decrease of 792,507 shares.

93.     On November 16, 2015 alone, Nomura sold another 300,116 Carbures shares.

94.     Carbures has made repeated requests and demands on Nomura, EMI, Toros and Maass to cease and desist from their unlawful activity in connection with the Carbures shares being held as Collateral pursuant to the MLA.  They have willfully and wrongfully refused to do.

95.     Carbures has no adequate remedy at law and is suffering irreparable harm and damage as a result of the conversion of the Carbures shares being held as Collateral purusant to

the MLA by EMI, Toros, Maass and Tomura in an amount not yet determined or ascertainable but, upon information and belief, in excess of $20,000,000.

96.    The tortious and unlawful actions of EMI, Toros and Maass, ae such as to warrant an award of punitive damages against them and in favor of Carbures in the amount of $50,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1.    On Plaintiff's First, Second, Third and Fourth Claims for Relief, an order enjoining Defendants, their agents, servants, employees and all those acting under their control, on their behalf or in concert with them, from loaning, pledging, repledging, hypothecating, rehypothecating, selling, trading or otherwise dealing in, in any way whatsoever (whether in any exchange, over-the-counter or any other transaction) the shares of Carbures capital stock which were transferred to EMI Cayman and were to be held as collateral (the "Share Collateral") pursuant to the Margin Lending Agreement entered into between Carbures, EMI Cayman, EMI Ltd. and others on September 25, 2015;

2.    On Plaintiff's First Claim for Relief against EMI Cayman and EMI Ltd. for breach of contract and breach of the duty of good faith and fair dealing, in addition to the injunctive relief sought above: (a) judgment against them jointly and severally in an amount not less than $50,000,000; and (b) if Carbures so elects, rescission of the the MLA and all related agreements based upon the material breach by EMI Cayman and EMI Ltd. of their obligations thereunder;

3.    On Plaintiff's Third Claim for Relief against EMI Cayman, EMI Ltd., Toros and Maass for fraud, in addition to the injunctive relief sought above: (a) judgment against them

jointly and severally in an amount not less than $50,000,000 in compensatory damages and $100,000,000 in punitive damages; and (b) if Carbures so elects, rescission of the the MLA and all related agreements based upon their fraudulent inducement of Carbures to enter into such agreements

      4.     On Plaintiff's Fourth Claim for Relief against all Defendants for conversion, in addition to the injunctive relief sought above, judgment against them jointly and severally in an amount not less than $50,000,000 in compensatory damages and $100,000,000 in punitive damages.

      5.     Awarding Plaintiff its costs in this action together with reasonable attorney's fees and expenses; and

      6.     Awarding Plaintiff such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       November 23, 2015

                                    PRYOR CASHMAN LLP

                          By: _____
                              Philip R. Hoffman, Esq.
                              phoffman@pryorcashman.com
                              Jonathan T. Shepard, Esq.
                              jshepard@pryorcashman.com
                              Bryan T. Mohler, Esq.
                              bmohler@pryorcashman.com
                              Attorneys for Plaintiff
                              7 Times Square
                              New York, New York  10036-6569
                              (212) 421-4100

**EXHIBIT A**

*Execution Copy*

# MARGIN LENDING AGREEMENT

This Margin Lending Agreement (this "Agreement") by and among Emerging Markets Intrinsic Cayman, a Cayman Islands company, as lender ("Lender"), Carbures Europe S.A., a *sociedad anónima* organized under the laws of Spain, as borrower ("Borrower"), SRT Capital FF LLC, a limited liability company organized under the laws of the State of Delaware ("SRT"), Neuer Gedanke, S.L., a *sociedad limitada* organized under the laws of Spain ("NG") and BTC DOS S.ár.l, a *société à responsabilité limitée* organized under the laws of [Luxembourg] ("BTC"), by Emerging Markets Intrinsic, Ltd ("Agent") as agent and governs all loans of money (the "Loans") that Lender may, from time to time, in its sole and absolute discretion, agree to make to Borrower.

1.     **LOAN TERMS; SHARE COLLATERAL.**  The terms applicable to the Loans are as specified in the summary of terms and conditions attached hereto as Exhibit A.  The rights of Lender or Agent under this Agreement are cumulative and in addition to any other rights, remedies, benefits and protections that Lender or Agent may have under Exhibit A, but in the event of any direct conflict with or inconsistency between this Agreement and Exhibit A, the provisions of Exhibit A shall control.  Pursuant to Exhibit A, Borrower is to provide 14.00 million EUR worth of capital stock of Borrower as collateral (the "Share Collateral") to Lender for the repayment of the Loans.  NG and BTC are contributing such Share Collateral to SRT in connection with their subscription for a membership interest in SRT and SRT is providing the Share Collateral to Lender on behalf of Borrower.

2.     **PURPOSE OF THE LOANS.**  Borrower is able to use loan proceeds as desired without restriction.

3.     **INTEREST AND LOAN FEES.**  Borrower agrees that interest and fees will accrue on all outstanding Loans in accordance with the methods described in the summary of terms and conditions attached hereto as Exhibit A.  Borrower agrees that any accrued interest and/or fees not paid at the close of an applicable period shall constitute an additional Loan of money hereunder.  Notwithstanding any other provision of this Agreement and in all events and circumstances, interest on Euro 7.00 million at the rate provided in Exhibit A accrues and is due and payable to Lender by Borrower from the date of the first advance of proceeds of the Loan until the four (4) year anniversary of this Agreement regardless of any substitution of Cash Collateral (as defined herein), or any prior prepayment by Borrower.  In the event of any payment of the exercise price for shares under the Warrant (as defined herein) by issuance of a credit memo against the Loan, interest on principal portion of the Loan represented by such credit memo shall continue to accrue and be payable to Lender until receipt of the warrant shares deliverable to Lender upon such exercise.

4.     **AGENT AS AGENT OF LENDER AND BORROWER.**

(a)     Lender, Borrower and SRT (each, a "Principal") each appoint Agent to act as agent with regard to any all actions necessary to effect Loans as described in this Agreement, and Agent acknowledges and accepts such appointment.

CZ954904

(b)     As agent of each of the Principals and in compliance with all applicable regulations, Agent will arrange all Loans.

(c)     In connection with each Loan, Agent acts solely in its capacity as agent for the Principals pursuant to instructions from the Principals or pursuant to discretionary authority granted to it by Borrower under the applicable Subscription Documents. Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral (as defined herein) in its possession shall be to deal with it in the same manner as Agent deals with similar securities and property for its own account. Agent shall have no responsibility or personal liability to either principal arising from any failure by a Principal to pay or perform any obligation hereunder. Notwithstanding anything herein to the contrary, Agent shall not have any responsibility for or any obligation or liability to either Principal with respect to the monitoring of margin maintenance hereunder. Each Principal agrees to proceed solely against the Collateral (as defined below) or the other Principal to recover any amount owing to it or to enforce any of its other rights in connection with, or as a result of any Loan. The Principals acknowledge that Agent is acting solely as an agent hereunder, and the Principals agree to hold Agent harmless from all liability except for losses or damages caused by Agent's gross negligence or willful misconduct.

(d)     Each Principal and Agent hereby agree that any and all notices, demands, communications, payments or deliveries of any kind relating to any Loan may be delivered or made solely through Agent.

## 5.     COLLATERAL.

(a)     Lender may from time to time, in its sole and absolute discretion but consistent with the Loan parameters specified in Exhibit A, demand that Borrower or SRT, deliver for credit to a securities account maintained by Lender (any such account, "Lender's Account") collateral in the form of cash or securities, in such amounts and/or currencies as are consistent with the Loan parameters specified in Exhibit A. Borrower shall directly comply, and shall cause SRT to comply, with any such demand in accordance with the time period(s) set out in Exhibit A, and any failure to comply shall constitute a default under this Agreement. Borrower shall ensure that at all times the Market Value (as defined below) of the cash and securities collateral delivered to Lender's Account exceeds the sum of (i) the aggregate Market Value (as defined below) of the cash lent under outstanding Loans and (ii) the margin requirement determined by Lender from time in accordance with the summary of terms and conditions attached hereto as Exhibit A and notified to Borrower (the "Margin Requirement").

"Market Value" means:

(i)     With respect to cash, the amount of such cash (converted, if necessary, into U.S. dollars at a spot rate obtained from a source selected by Lender in its sole and absolute discretion); and

(ii)     with respect to securities, the price for such securities obtained from a source selected by Lender in its sole and absolute discretion; provided that, (A) if prices for such securities are available on an exchange, the price shall be the closing price on

such exchange and (B) the price of securities that are suspended, or in respect of which there is no source or a discontinuous source, shall be determined by Lender in its sole and absolute discretion. Market Value is determined by Lender solely for the purposes of determining Margin Requirements and should not be relied on by Borrower for any other purposes.

(b)     As security for Borrower's payment and performance of all of its obligations and liabilities (whether or not mature or contingent) from time to time ("Liabilities") to Lender or Agent under the Loan, this Agreement, any other document or agreement executed in connection with any Loan or this Agreement (including, without limitation, the Warrant of even date herewith from Borrower to Lender (the "Warrant")) and for all obligations owing to Lender hereunder or thereunder by Borrower (the "Obligations"), Borrower and SRT each hereby grants to Lender a continuing first priority security interest in and to the Cash Collateral, the Collateral Shares, all of Borrower's and SRT's other securities and cash from time to time delivered under this Agreement or otherwise held by, or under the control of, Lender (the "Collateral") and all products and proceeds of the Cash Collateral, the Collateral Shares and the other securities and cash, irrespective of whether or not Lender has made advances to Borrower in connection with such securities or other property. All Collateral shall be free and clear of all prior liens, claims and encumbrances (other than the lien in favor of Lender and its affiliates), and Borrower and SRT will not cause or allow any of the Collateral, whether now owned or hereafter acquired, to be or become subject to any liens, claims or encumbrances of any nature other than the security interest created in Lender's favor and in favor of its affiliates. Borrower, SRT and Lender acknowledge and agree that the delivery of any securities to Lender or Agent constitutes "control" by Lender or Agent for the purpose of perfection of a security interest in the Collateral under the Uniform Commercial Code in effect from time to time in the State of New York. Borrower and SRT agree that any Collateral may be transferred and held in the name of appointed designee, however not in the name of the Agent. Borrower and SRT shall execute such documents and take such other action as Lender shall reasonably request in order to perfect Lender's rights with respect to any Collateral. In addition, each of Borrower and SRT hereby appoints Agent and each of its affiliates as Borrower's agent and attorney-in-fact to take any action, including without limitation to sign, seal, execute and deliver all documents, as may be required to perfect Lender's interest in and to realize upon all of Lender's rights in the Collateral or to otherwise accomplish the purposes of this Agreement, including the filing of one or more financing statements under the Uniform Commercial Code identifying Borrower as Debtor and Lender as Secured Party. Upon the occurrence of an Event of Default (as defined herein), in order to satisfy any of Borrower's Obligations, Lender may, to the fullest extent permitted by law, at any time in its discretion and without additional prior notice to Borrower, SRT, BTC or NG, use, apply or transfer any and all Collateral.

(c)     Except as noted in the last sentence of this subsection, within the limits of applicable law and regulations, Borrower and SRT hereby authorize Lender to lend only to itself and within SRT Capital any or all Collateral, to convey therewith all attendant rights of ownership, and to use all such Collateral as collateral. Any Collateral may be pledged, repledged, hypothecated or rehypothecated either separately or in common with other property for any amounts due to Lender thereon or for a greater sum, and Lender shall have no obligation to retain a like amount of similar property in its possession and control. Unless otherwise agreed by Lender, SRT and Borrower, SRT will be entitled to (i) vote any securities constituting the

-3-

Collateral, to give consents, waivers, proxies and ratifications with respect thereto, to refrain from doing any of the foregoing and to act with respect thereto as though Borrower were the outright owner thereof and to otherwise exercise all other corporate rights with respect to the securities constituting the Collateral and (ii) receive all distributions, including, but not limited to, cash, stock dividends and interest payments, made on or in respect of any loaned, pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by Borrower, to the full extent Borrower would be entitled if the securities had not been loaned, pledged, repledged, hypothecated or rehypothecated. Except under or after an Event of Default scenario or allowed as a hedge under Exhibit A hereto, Collateral will not be (i) loaned, pledged, repledged, hypothecated or rehypothecated outside of the Lender or structure itself or (ii) sold or traded in any exchange or over-the-counter transactions.

(d)     Upon satisfaction by Borrower of all Obligations (and all other obligations owed by Borrower to each affiliate of Lender), Lender shall return to Borrower or SRT (as the case may be) the Collateral.

(e)     Borrower and SRT authorize and request Agent, as agent for Borrower and SRT, to transfer cash or securities from the account(s) of Borrower or SRT opened, maintained or contributed pursuant to the Subscription Agreements of NG and BTC to SRT, to Lender's Account as Collateral under this Agreement. In addition, if, at any time, Borrower has provided excess collateral under this Agreement and also is required to deliver margin, collateral or other credit support (including title transfer credit support) to Lender under this or any other agreement, then Borrower and SRT authorize and request Lender to transfer such excess collateral to itself on Borrower's or SRT's behalf in order to satisfy (to the extent possible) Borrower's obligation to deliver margin or credit support under this or such other agreement. If Lender or Agent makes a delivery on Borrower's or SRT's behalf pursuant to this Section 5(e), such delivery shall have the same effect as if Borrower itself had made such delivery under the applicable agreement.

(f)     Notwithstanding anything contained herein to the contrary, Borrower may, at any time and from time to time after the second anniversary of this Agreement and in its sole discretion, provide to Lender cash equal to Euro 3.50 million in the aggregate (the "Cash Collateral") as the substitute Collateral under this Agreement. In the event of the exercise of such right, then the Lender shall return the twice the equivalent Market Value of Share Collateral to SRT as the amount of substituted Cash Collateral and release such equivalent Share Collateral value from the security interest under this Agreement provided, however, under no circumstances shall Lender be obligated to so return and release any Share Collateral if, and to the extent that, such release would cause the Market Value of then Share Collateral held by Lender hereunder to be less than the then balance of € 7.00 million worth of capital stock of the Company that remains exercisable under the Warrant.

(g)     Notwithstanding anything contained herein to the contrary, if NG, a member of SRT, desires to provide additional unrestricted, registered, unencumbered and electronic shares of the capital stock of Borrower to SRT (the "NG Shares") and have SRT pledge the NG Shares as Share Collateral hereunder and as a substitute for the Collateral Shares that were contributed by BTC, also a member of SRT, to SRT (the "BTC Shares") and are held as Share Collateral under this Agreement, then upon such substitution and delivery of the NG Shares to Lender,

Lender shall return a like number of BTC Shares to SRT and release such BTC Shares as Share Collateral from the security interest under this Agreement.

(h)     The Lender agrees that a modification in accordance with Section 5(f) or 5(g) hereof shall not constitute an Event of Default under Section 6(a)(viii) below.

## 6.   EVENTS OF DEFAULT.

(a)     The occurrence of each of the following is an "Event of Default" hereunder:

(ii)     Borrower's or SRT's failure to maintain collateral as required by Section 5 hereof and Exhibit A;

(iii)     Borrower's failure to make any payment or delivery when required hereunder, under Exhibit A or the Warrant;

(iv)     Borrower's failure to comply with or perform any other agreement or obligation hereunder;

(v)     Borrower, or any general partner, managing member or analogous representative entity of Borrower shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets; or Borrower shall make a general assignment for the benefit of its creditors; or there shall be commenced against Borrower any case, proceeding or other action of a nature referred to above in this clause which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed or undischarged for a period of sixty (60) days;

(vi)     any representation made or deemed to have been made by Borrower under this Agreement or Exhibit A shall be incorrect or untrue in any respect when made or deemed made;

(vii)     Borrower states that it is unable to, or intends not to, perform any of its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent;

(viii)     any event of default or equivalent event occurs under any other written agreement between Borrower and Lender or Agent or any of their affiliates; or

(ix)     subject to Section 5(f) and (g) above, any material document or constitutive document of Borrower is modified in a manner which, in the sole and absolute discretion of Lender, may have a material adverse effect on any Loan or

Borrower's ability to perform its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent.

(b)   Upon the occurrence of an Event Default, the Lender may notify Borrower that all Loans are immediately due and payable.  Upon and at any time after providing such notice, Lender shall have all of the rights of a secured party upon default under the Uniform Commercial Code in effect from time to time in the State of New York and other applicable laws, rules and regulations, including, without limitation, the right, without additional notice to Borrower, NG, BTC or SRT, to cancel any outstanding commitments for or relative to any Loan and/or apply any Collateral to, or sell any or all of the Collateral and apply the proceeds to, any Loan (or to the purchase of securities that are the subject of any Loan).  Such purchases and/or sales may be effected by Lender (or Agent, as its agent) publicly or privately without notice or advertisement in such manner as Lender may in its sole discretion determine.  At any such sale or purchase, Lender, Agent or any of Lender or Agent's affiliates may purchase or sell the property to or from itself or third parties free of any right of redemption.  Lender shall have the right to convert currencies in connection with the exercise of its rights hereunder in such a manner as it may determine, in its sole discretion, to be commercially reasonable. Any surplus of such proceeds after payment in full of outstanding Obligations shall be paid over to Borrower.

(c)   <u>Events of Default Recourse.</u> Recourse under this Agreement as well as Exhibit A is limited to the Collateral.  The Borrower assumes no other risk or recourse under either Agreement and Lender shall have no other recourse to the Borrower or other assets of the Borrower.

7.   **MISCELLANEOUS.**

(a)   <u>Capacity to Contract.</u>  Borrower represents and warrants to Lender and Agent that it has the capacity and authority to enter this Agreement and each Loan and make each pledge of Collateral. Each representation or warranty made by Borrower in this Agreement will be deemed to be repeated on each date on which (i) a Loan is made, (ii) Collateral is delivered or released or (iii) any other transaction occurs hereunder.

(b)   <u>ERISA.</u>  Borrower represents and warrants to Lender and Agent that Borrower is not an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA") or a person acting on behalf of an ERISA Plan and that the Borrower's assets do not constitute assets of an ERISA Plan.

(c)   <u>Compliance with Regulations.</u>  All Loans are subject to the laws, rules and regulations of the United States and any other applicable jurisdiction and all relevant securities exchanges.

(d)   <u>Adequate Assurances.</u>  Subject to, and not as limitation of, the rights of Lender under this Agreement, if at any time Lender has reasonable grounds for insecurity with respect to Borrower's performance of any Obligation, Lender shall notify Borrower in writing of the reasons for insecurity and any action it would reasonably request the Borrower to take. Borrower shall respond in good faith, responding to and curing the issues raised by Lender within 5 business days, addressing any and all actions requested by the Lender.

(e)     <u>Costs and Expenses</u>.  Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender or Agent (including, without limitation, costs of collection, attorneys' fees, court costs and other expenses) in connection with the negotiation, execution and delivery of this Agreement, the Warrant and the Subscription Agreements and any amendment or modification hereof or thereof, any substitution of Cash Collateral or NG Shares or enforcing Lender's or Agent's rights hereunder or under the Warrant or Subscription Agreement provided, however, Borrower shall only be obligated to pay fifty percent (50%) of the amount of legal fees and expenses related to the negotiation, execution and delivery of this Agreement, the Warrant and the Subscription Agreements which amount shall not exceed € 25,000.  In each case and whether or not demand has been made therefor, Borrower hereby authorizes Lender to increase the amount of any outstanding Loan by any and all such costs, liabilities and damages, including without limitation, those incurred in connection with the liquidation of any of the Collateral.

(f)     <u>Securities Events</u>.  Lender shall inform Borrower if Lender becomes aware, other than by way of material non-public information, of the occurrence or prospective occurrence of any of the following with respect to any securities pledged to Lender, and Borrower shall inform Lender if Borrower becomes aware, other than by way of material non-public information, of the occurrence or prospective occurrence of any of the following with respect to any securities pledged to Lender:  conversions, subdivision or consolidation; redemption; a takeover offer; a capitalization issue; rights issue; distribution of income in the form of securities; or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities.

Subject to 5(c), above, if Lender receives notice from Borrower that Borrower wishes Lender to take action in order for Borrower to act on any of the events referenced in this paragraph and such notice is received by Lender within a reasonable time for Lender to act on such event, Lender will act in accordance with Borrower's wishes.  Borrower represents that it will review all prospectuses and offering statements that it may receive and understands the risks inherent with the Loans, including any risks associated with the above-described securities events.

(g)     <u>Voting Rights</u>.  So long as BTC and NG are members of SRT, they shall each retain the right, by notice to Lender and SRT and subject to Lender's and SRT's rights, to require SRT and Lender to exercise voting rights with respect to Share Collateral as directed by BTC or NG, as the case may be.  Lender and SRT shall respond to BTC or NG, as the case may be, either orally or in writing within a maximum of 8 hours and act in accordance with BTC's or NG's voting instructions or preferences.

(h)     <u>Waiver, Assignment and Notices</u>.  Neither Lender's failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereof nor any continued course of such conduct on its part shall constitute or be considered a waiver by Lender of any of its rights or privileges hereunder.  Any purported assignment of your rights and/or obligations hereunder without obtaining the prior written consent of an authorized representative of Lender and Agent shall be null and void.  Lender and Agent each reserve the right to assign any of its rights or obligations hereunder or under any other agreement with Borrower to any of their affiliates without prior notice to Borrower.  All notices (including without limitation demands for collateral), consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written

confirmation of receipt), (b) sent by facsimile or email at the number or address set forth below (with receipt or confirmation of delivery requested) or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), addressed to a party at the address set forth below.  Either party may change its number or address set forth on the signature page by written notice to the other party in accordance with this Agreement.

| If to Borrower, BTC, NG or SRT: | CARBURES EUROPE S.A.<br>Tecnoparque Bahía de Cádiz<br>Ctra El Puerto Santa María – Sanlúcar km 5.5<br>Calle Ingeniería, 4<br>11500 El Puerto de Santa María, Cádiz (Spain)<br>Attention: Ignacio Baron Lopez<br>Fax:  34 956 54 92 08<br>Email: ignacio.baron@carbures.com |
|---|---|
| If to Lender or Agent: | EMERGING MARKETS INTRINSIC CAYMAN<br>31 Thimble Farms Road/Suite 200<br>Branford, CT  06405<br>Attention: Eric Maass<br>Fax:  None<br>Email:  confi@emintrinsic.com |

(i)    Legally Binding.  Borrower hereby agrees that this Agreement and all of the terms hereof shall be binding upon it and its successors and assigns.  Borrower hereby waives any and all defenses that any oral instruction was not in writing as may be required by any applicable law, rule or regulation.  Borrower hereby authorizes Lender and Agent to accept and act on any instructions received by Lender and/or Agent from any authorized investment manager. Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender and/or Agent (including, without limitation, attorneys' fees, court costs and other expenses) in connection with Lender and/or Agent acting in reliance upon instructions from any such authorized investment manager or advisor, including, but not limited to, instructions transmitted via electronic means, including facsimile or electronic mail.

(j)    GOVERNING LAW.  THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF.

(k)    JURISDICTION; WAIVER OF JURY TRIAL.  The parties shall attempt in good faith to promptly resolve any dispute arising out of, relating to or in connection with this Agreement or any transactions hereunder by negotiations by executives of the parties who have the authority to settle the controversy.  With respect to any suit, action or proceedings relating to

this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party. ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION IS HEREBY WAIVED BY ALL THE PARTIES TO THIS AGREEMENT.

(l)     NO CONSEQUENTIAL DAMAGES.  IN NO EVENT WILL LENDER OR AGENT BE LIABLE TO BORROWER, SRT, BTC OR NG FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT or any other agreement or document executed in connection herewith or the transactions contemplated hereby or thereby or any lost profits, diminution in value of Share Collateral or loss of the use of property or Share Collateral.

(m)     Headings.  The headings of the provisions hereof are for ease of reference only and shall not affect the interpretation or application of this Agreement or in any way modify or qualify any of the rights provided for hereunder.

(n)     Cumulative Rights; Entire Agreement.   The rights, remedies, benefits and protections afforded to Lender and Agent under this Agreement and under any other agreement Borrower may have with Lender or Agent or any affiliate of Lender or Agent, whether heretofore or hereafter entered into, are cumulative and in addition to any other rights, remedies, benefits and protections that Lender or Agent may have.   To the extent that the provisions of any agreements Borrower has with Lender or Agent, whether heretofore or hereafter entered into, are inconsistent (whether the inconsistency be between the agreements or within a single agreement), the conflict shall be resolved in favor of the provision which affords Lender or Agent (as applicable) with the maximum rights, remedies, benefits or protections.   Except as set forth above, this Agreement represents the entire agreement and understanding between Borrower, Agent and Lender concerning the subject matter hereof.

(o)     Counterpart Execution.  This Agreement may be executed in one or more counterparts which, when taken together, shall constitute one and the same instrument.   Any party may execute this Agreement by delivery to the other party of a facsimile copy hereof evidencing such party's signature.   In any such case the party executing by facsimile shall promptly thereafter provide a signed original counterpart hereof to the other parties; provided, that the non-delivery of such a signed counterpart shall not effect the validity or enforceability hereof

[remainder of page intentionally left blank; signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused their respective duly authorized representatives to execute this Agreement on this, the 25th day of September 2015.

Lender:

EMERGING MARKETS INTRINSIC CAYMAN

By: Emerging Markets Intrinsic Cayman

By: _____
    Name: Bulent Toros
    Title: Managing Director

NEUER GEDANKE, S.L.

By: _____
    Name: _____
    Title:

BTC Dos S. àr.l

By: _____
    Name:
    Title:

Agent hereby agrees to and acknowledges its role as agent for both parties in accordance with Section 1.

Agent:

EMERGING MARKETS INTRINSIC, LTD

By: _____
    Name: Mr. Eric M. Maass
    Title: Managing Partner

Borrower:

CARBURES EUROPE S.A.

By: _____
    Emilio Ignacio Barón
    Title: Chief Financial Officer

SRT CAPITAL FF LLC

By: _____
    Name: _____
    Title:

-10-

IN WITNESS WHEREOF, the parties hereto have caused their respective duly authorized representatives to execute this Agreement on this, the 25th day of September 2015.

Lender:

EMERGING MARKETS INTRINSIC CAYMAN

By:  Emerging Markets Intrinsic Cayman

By: _____

Name: Bulent Toros
Title:  Managing Director

NEUER GEDANKE, S.L.                    Borrower:

CARBURES EUROPE S.A.

By: _____        By: _____
Name: _____           Name:  Ignacio Baron
Title: _____            Title:  Chief Financial Officer

BTC Dos S. àr.l                        SRT CAPITAL FF LLC

By: _____        By: _____
Name: _____           Name:  Eric M MAASS
Title: _____            Title:  Managing Member

Agent hereby agrees to and acknowledges its role as agent for both parties in accordance with Section 1.

Agent:

EMERGING MARKETS INTRINSIC, LTD

By: _____

Name: Mr. Eric M. Maass
Title:  Managing Partner

-10-

IN WITNESS WHEREOF, the parties hereto have caused their respective duly authorized representatives to execute this Agreement on this, the 25th day of September 2015.

Lender:

EMERGING MARKETS INTRINSIC CAYMAN

By: Emerging Markets Intrinsic Cayman

By: _____
Name: Bulent Toros
Title: Managing Director

NEUER GEDANKE, S.L.

By: _____
Name: Manuel Ignacio Diaz Charlo
Title: Director

Borrower:

CARBURES EUROPE S.A.

By: _____
Name: _____
Title:

BTC Dos S. ár.l

By: _____
Name:
Title:

SRT CAPITAL FF LLC

By: _____
Name: _____
Title:

Agent hereby agrees to and acknowledges its role as agent for both parties in accordance with Section 1.

Agent:

EMERGING MARKETS INTRINSIC, LTD

By: _____
Name: Mr. Eric M. Maass
Title: Managing Partner

-10-

IN WITNESS WHEREOF, the parties hereto have caused their respective duly authorized representatives to execute this Agreement on this, the 25th day of September 2015.

Lender:

EMERGING MARKETS INTRINSIC CAYMAN

By:  Emerging Markets Intrinsic Cayman

By: _____
Name: Bülent Toros
Title:  Managing Director

NEUER GEDANKE, S.L.

By: _____
Name: _____
Title: _____

Borrower:

CARBURES EUROPE S.A.

By: _____
Name: _____
Title: _____

BTC Dos S.àr.l

By: _____
Name: _____
Title: _____

YANNICK KANTOR

SRT CAPITAL FF LLC

By: _____
Name: _____
Title: _____

Agent hereby agrees to and acknowledges its role as agent for both parties in accordance with Section 1.

Agent:

EMERGING MARKETS INTRINSIC, LTD

By: _____
Name: Mr. Eric M. Moass
Title:  Managing Partner

-10-

**EXHIBIT A**

**TERMS AND CONDITIONS OF LOAN**

# <u>SEE EXECUTED TERM SHEET</u>

# EMERGING MARKETS INTRINSIC, Ltd

Execution Copy

# Margin Lending Agreement Term Sheet

### GENERAL TERMS:

| | |
|---|---|
| **Transaction** | Secured Loan against Shares of Carbures Europe S.A. |
| **Borrower** | **CARBURES EUROPE SA** |
| **Lender** | Emerging Markets Intrinsic Cayman LTD (Asset management license number 656961) |
| **Shares** | Shares of Borrower (Bloomberg: **CAR.SM**), denominated in EUR. All Shares delivered as Collateral hereunder must be electronic, registered and unrestricted. ISIN code is ES0116162068 |
| **Recourse** | Under all circumstances, Lender's recourse is limited only to the Shares and Additional Collateral with no other recourse to the Borrower or other assets of the Borrower |
| **Business Day** | A day upon which banks are open for business in Spain |
| **Currency Business Day** | A day upon which commercial banks are open for business in the US. If the due day for a payment is not a Currency Business Day, payment shall be made on the next following Currency Business Day |
| **Exchange Business Day** | A day upon which the Shares are scheduled to trade on the Exchange |
| **Exchange** | Soc Bol, SIBE |
| **Segregated Portfolio Company Account** | Subscription 'CAR' in SRT Capital FF LLC, a Delaware LLC incorporated under the laws of the United States of America, which shall serve as provider of the Share Collateral for the Loan |

### FINANCING TERMS:

| | |
|---|---|
| **Trade Date** | Sep 25, 2015 |
| **Effective Date** | 5 Currency Business Days after the Trade Date |
| **Maturity Date** | 48 months following Effective Date. |
| **Extension(s)** | One 12 month extension with the consent of both parties; If Extension is elected, Collateral shall be locked up for the extension term |
| **Collateral Mechanics** | In two installments via Free of Payment Transfer to Custodial account assigned to Borrower's Segregated Portfolio Company Accounts |
| **Capital Shares** | CAR.SM ordinary, unrestricted shares |
| **Collateral** | 14.00 million EUR worth of Capital Shares in Segregated Portfolio Account Company Account |

1

# EMERGING MARKETS INTRINSIC, Ltd

| | |
|---|---|
| **Loan Amount** | EUR 7.0 million in two separate installments of EUR 3.0 million for the first installment and EUR 4.0 million for the second installment. First installment not disbursed until at least 6.00 million EUR worth of Capital Shares are pledged as collateral and second installment will not be disbursed until remainder of 14.00 million EUR worth of Capital Shares are pledged as collateral. |
| **Loan to Value (LTV)** | 50% |

**INTEREST & FEES:**

| | |
|---|---|
| **Interest Rate** | 6.00% per annum |
| **Interest Payment Dates** | Quarterly following the Effective Date, payable in arrears |
| **Origination Fee:** | None |
| **Warrants:** | Borrower will issue to Lender a Warrant to purchase up to 7.00 million Euro worth of Capital Shares of Borrower at a 25% discount from the volume weighted average closing price ("**VWAP**") of such shares on the exchange in which such shares are traded during the 40 trading days prior to the date of exercise of such warrant. In the event that Company does not timely issue the shares for which the Warrant has been exercised, Lender may transfer such number of shares from the Share Collateral to the outright ownership account of the Lender and in satisfaction of the Borrower's obligation to issue such shares. |

**COLLATERAL TERMS:**

| | |
|---|---|
| **Loan Security** | Shares deposited in a custody account with the Custodian in SPC's name (the "**Collateral Account**") and to be pledged to Lender as security against this facility (the "**Security Arrangement**"), and Cash in EUR to be transferred outright by the Lender |
| **Custodians** | Citibank, Madrid or Deutsche Bank Madrid |
| **Collateral Shares** | Shares in the Collateral Account |
| **Number of Collateral Shares** | 14.00 million EUR worth of Shares of CAR.SM in the Segregated Portfolio Company Account |
| **Initial Price** | EUR .95 (Share Price on Exchange Business Day immediately before Trade Date) |
| **Collateral Call** | In the event that the aggregate value of the Collateral Shares using current Share Price and Additional Collateral at any time, on any given Exchange Business Day, falls below Euro 11,480,000 |
| | i.  Lender may call, from time to time, for an amount of Additional Collateral from Borrower (the "**Top Up Amount**") such that the aggregate value of the Collateral Account using current Share Price is topped up to 14.00 million EUR. |

2

# EMERGING MARKETS INTRINSIC, Ltd

|  |  |
|---|---|
| | ii.      Borrower shall pay (or deliver) to Lender, according to the terms for the Cure Period below, the amount of cash so called for by Lender as Additional Collateral |
| **Exposure in Shares** | Number of Collateral Shares * Share Price |
| **Share Price** | The then current market price per Share on the Exchange with respect to the relevant Exchange Business Day. If no closing price is published or a market disruption has occurred on the relevant Exchange Business Day, the Share Price shall be determined by the Calculation Agent using its reasonable judgment in good faith |
| **Additional Collateral** | At least 50% of the Top Up Amount in Cash in EUR and the balance of the Top Up Amount in additional CAR.SM shares based on then current Share Price. Borrower may pay in other currency instead on the basis that the amount is immediately converted into EUR at the spot rate determined by Lender as if it would be paid in EUR |
| **Additional Collateral Balance** | The actual amount of cash and CAR.SM shares posted as Additional Collateral and held by the Lender at any time and dividends received under the Collateral Shares once transferred to the Lender as Additional Collateral (see below under "Dividends") |
| **Return of Additional Collateral** | Additional Collateral contributed by the Borrower will be returned in full by Lender to the Borrower upon request of Borrower once Collateral Shares rebound to the Initial Price and remain on or above Initial Price for three consecutive Business Days. VWAP is used as measure for this 3 day period to determine if the VWAP Share Price is genuinely above Initial Price. Lender shall return all Additional Collateral within 2 business days after the determination that the VWAP Share Price equals or exceeds the Initial Price. |
| **Cure Period** | Normal Collateral Call<br><br>• Borrower's agent bank to provide SWIFT instructions evidencing the payment of the required funds within 72 hours immediately following the day of the Collateral Call<br>• Borrower to pay the cash funds and provide additional CAR.SM shares to Lender as soon as possible but no later than 72 hours on the first Exchange Business day immediately following the day of the Collateral Call |
| **Interest on Additional Collateral** | Euribor, accruing daily on the Additional Collateral Balance as of a given day, payable by Lender on each Interest Payment Date |
| **Accrued Net Interest Amount** | At any time, the amount of accrued interest that is owed but unpaid on the Loan Amount less the amount of accrued interest that owes but unpaid on the Additional Collateral Balance |
| **Dividends** | Any cash amounts received as dividends under the Collateral Shares shall, upon receipt, initially be transferred to the Lender as Additional Collateral, and simultaneously to the discharge of this obligation Lender will release any such cash amount from the pledge under the Security Arrangement. |

CZ954004

# EMERGING MARKETS INTRINSIC, Ltd

|  | Immediately thereafter or at any later time, Borrower has the right to withdraw any such amounts from the Additional Collateral Balance provided that: |
|---|---|

|  |  |  |
|---|---|---|
|  | i. | No Collateral Call is outstanding |
|  | ii. | The effect of such withdrawal does not increase the Actual LTV above the Required LTV calculated as of the date of the withdrawal |
|  | iii. | No Event of Default is outstanding |
|  | iv. | No evidence in respect of a Mandatory Prepayment has been given |

|  |  |
|---|---|
| **Substitute Collateral** | Borrower shall have right to substitute cash collateral for the Share Collateral and obtain a release of the equivalent value of Share Collateral at current Share Price and any dividends thereon then held as collateral. Such substitution may not occur prior to the 2nd year anniversary of the Effective Date and the aggregate substituted cash collateral may not exceed 50% of the then outstanding principal amount of the Loan |

### REPAYMENT TERMS:

|  |  |
|---|---|
| **Loan Repayment** | (1) On the Maturity Date, Borrower shall repay the Loan Amount plus any other owed outstanding cash amounts.  No prepayment of the principal is allowed. |
|  | (2) Following such payment, Lender shall return the Additional Collateral Balance plus any related Interest on Additional Collateral owed |
|  | (3) Lender shall release from the pledge all Collateral Shares subject to the Security Arrangement following satisfaction of the cash payments above and return invested capital to Borrower |
|  | Payment Netting may apply at the election of the Lender |

|  |  |
|---|---|
| **Events of Default** | To Include: |

|  |  |  |
|---|---|---|
|  | i. | Failure to pay (subject to applicable cure periods), bankruptcy of the Company and/or the Borrower, other market standard events of default. |
|  | ii. | Borrower has failed to comply with any of the Covenants in the Warrant or the Margin Lending Agreement or any of the Representations & Warranties in the Warrant or the Margin Lending Agreement are inaccurate |

|  |  |
|---|---|
| **Accelerated Liquidation Events** | None |
| **Live Price** | The last official traded price per Share on the Exchange at any point in time on any Exchange Business Day, converted into EUR at the prevailing spot rate at the time |
| **Consequences of Events of Default &** |  |
| **Liquidation Events** | Following an Event of Default the Lender may immediately (i) accelerate the interest and principal repayment in the Transaction, (ii) offset any Additional Collateral Balance against the Loan Amount plus |

4

# EMERGING MARKETS INTRINSIC, Ltd

any other owing outstanding cash amounts, and (iii) enforce its right under the pledge over the Collateral Accounts to recover the Loan Amount plus any other owing outstanding cash amounts

**OTHER TERMS:**

| | |
|---|---|
| **Miscellaneous** | Market standard adjustment events shall be applicable |
| **Facility/Collateral/Calculation Agent** | SRT Capital SPC, Ltd |
| **Governing Law** | United States, New York |

**Representations & Warranties & Covenants**

(1) Borrower is able to pay its debts and liabilities as and when they become due and payable. The Collateral Shares are duly owned by the SRT Capital FF LLC and such shares are validly issued, fully paid and non-assessable, registered for resale on all exchanges on which the CAR.SM shares are traded and otherwise are unrestricted and freely tradable without restriction, volume limitation, notice or filing with any third party. The Transaction and all agreements executed in connection herewith by the Borrower (a) have been duly authorized and approved by the Borrower and are fully enforceable; (b) are in compliance with all laws and do not violate or conflict with any document, agreement, law or order applicable to the Borrower and (c) do not require the consent, notice or approval of any third party or governmental authority.

(2) Lender has the right to hedge Exposure in Shares using any strategy Lender deems suitable and all exposure and risk of the Lender related to the counterparty to such strategy shall be for the account of the Borrower.

(3) In the Event of Default due to a Margin Call, Lender can sell Shares equal to Margin Call amount

(4) In the Event of Default, due to principal repayment, Lender can sell Shares of total value, equal to principal loan value amount plus any unpaid interest

(5) Borrower shall not enter into agreement resulting in any pledge, lock-up, encumbrance or other restriction in respect of any Shares, without prior written approval from the Lender

(6) Borrower agrees to act in compliance with rules of the Segregated Custody Account's operational procedures and rules

| | |
|---|---|
| **Substituted Term Sheet** | This term sheet supercedes all prior term sheets related to the Transactions contemplated hereby. |

[remainder of page blank; signature page follows]

5

# EMERGING MARKETS INTRINSIC, Ltd

Agreed                     Borrower: CARBURES EUROPE SA

Authorized Signatory       _Ignacio Barón_

Date:                      September 25, 2015

Agreed                     Lender: EMERGING MARKETS INTRINSIC CAYMAN

Authorized Signatory:      Bulent Toros

Date:                      Sep 25, 2015

6

CZ954004